I'm Walter Boyacki. I'm the attorney from El Paso, Texas that represents the Burnham family. Can you speak a little louder? Yes, sir. I moved this microphone more towards my side. Is that better? Yes. Could you help me with a problem I have with the case? Yes, sir. It's a pretty sympathetic case, and the course and scope argument is one of the interesting ones. However, it looks to me as though we would not have to decide course and scope if there was no evidence that it was the government employees, oh, I forgot his name, Young, Richard Young. If there was no evidence that Richard Young caused the accident, no evidence cognizable under Rule 56, it looked to me as though there was no evidence up to at least the time that the proposed expert's report from the plaintiff was submitted and the judge said that was too late. If he's right about it being too late, if he's right about not allowing the late submission and it's not an abuse of discretion to keep it out, it looks like there's no evidence that the accident was Young's fault. So even assuming that the government is liable if it was, summary judgment would be proper. What am I missing there, and why was it an abuse of discretion for the judge to enforce the time deadline? Okay. It's actually much simpler, and I think, Judge, you had told us previously that you did some personal injury work. In this particular case, what we had was we had a debit. We even had this case. We had a deposition of an eyewitness to the accident who did not actually witness the accident. I thought there was no witness to the accident. There wasn't. One's dead and the other can't remember. Correct. He came the next day. That's a Mr. Delmont site. Site. That's correct. And we had his deposition that was submitted under the Rule 56. His deposition said, I came to the site. I found a puddle of oil in the northbound lane. I saw a yaw mark, a straight mark, that came from the Volkswagen in the correct lane, and all of the debris was all to the right-hand side of the road. So he had, I think, three or four different explanations for why this accident happened in the. . . Yes. And he sees an oil puddle in her proper lane. In the proper lane. The straight mark where the wheel came off the Volkswagen, where the frame then dug into the ground, is also in the proper lane. And then all of the mirrors, the glass, everything is on the proper side, again, of the street where it would have been propelled, which, as at that point, to tell you the truth, Judge, I thought that an accident reconstruction person in this case was really a waste of time. So even before the disputed, the evidence that was kept out because it was late was kept out, you had this lay witness. Yes, sir. Testifying to these three things. Yes. And we filed that response. And then all they had was, and boy, did we try. The DPS officer didn't show up for his deposition despite being subpoenaed twice. And in the accident report, which they used in their summary judgment, if you recall, it says in the accident report. . . Did he ever get his deposition? I don't remember the. . . No. We couldn't. Judge, he wouldn't answer his telephone calls. They gave us his dispatches. The answer is no. Just keep going, please. Okay. So we got nowhere with him, and despite the fact that he was subpoenaed twice. So I thought we had sufficient evidence. Tell me, I'm trying to figure out what to do about that. I've never heard of a policeman evading a deposition like that before. But you can't control it, and the defendants can't control it. Well, the defendant. . . The federal government can't control some local policeman showing up or not. Well, actually you can, Judge, because we had a subpoena for him, and then the defendant got an affidavit from that witness. And that was the basis of the summary judgment, his affidavit and the accident report. But for all we know, he was willing to give them an affidavit, but he wouldn't show up no matter. . . And we never knew. He wouldn't answer my calls. I filed a Daubert motion on him that he was unqualified. I didn't know what his qualifications were. Judge Ober ruled that. He moved to strike the police report on the ground that he failed to show up for his deposition? And the fact that he was unqualified. We didn't know what his qualifications were. I was more interested in the first than the second. What is your response to the district court's conclusion concerning Mr. Foote? I think the court, as I recall this, was concerned whether he really was a lay witness. And since he wasn't literally an eyewitness to the accident but came in afterwards, and that really he was an undisclosed expert and that you hadn't followed the rules for disclosing an expert. Well, Judge, if you recall in his deposition, I think it was generally agreed by the parties, especially by the defendant Young that was left, that he was not an expert. And we alleged that he was just a lay witness who had some expertise that should have gone to the jury. And we briefed that in the cases that showed that if you have something to add on, the jury is entitled to get that little bit of information that he happened to have. So in essence, you're saying he's a substitute for a bunch of photographs. He's not only a substitute for a bunch of photographs. The photographs really couldn't tell you and make the connection, for example, between the mark on the road and the Volkswagen part that made the mark. You would never make that connection unless somebody tells you, I went and looked and saw that when the wheel came off, this is where the wheel came off or this is where the. So in a sense, that is expertise of a kind. That's why I thought he was a lay witness under the rule, under 701, I think it is. I thought that he would qualify. But I thought it was more of a witness to an accident that measures the skid marks. That's really what you had here is you had somebody went out there and said, well, red light, green light, whatever. Here's the skid marks. And that's essentially what he did. He said, there's the oil. There's the yaw mark. There's the scrape. The important part of his testimony, which is where the oil was in her lane, the scrape was in her lane, and the glass was in her lane, you don't need to be an expert. We don't need to be an expert. The most you need an expert for is to say, based on my superior knowledge of car parts, that glass is from a car and not a beer bottle. And based on my superior knowledge of car parts, that scrape is from an axle after the wheel comes off, not from, well, I don't know what else. Yeah, what else? Right. So I thought, and see, and then what I did was. You're saying you had lay testimony that could come in regardless. Yes, sir. Yes, sir. That's just somebody, I think a 12-year-old girl could have told you the oil's right there and the scrape mark is right there. So even if his opinion was excluded, you're saying a jury might be able to draw an inference from where the oil and the glass and the scrape was. Absolutely. And then what I did at that point, Judge, was get a rebuttal witness. Tell me, how would the accident occur if it was in her lane? I'm trying to figure out how young could hit her in the driver's side if she was in her lane. You went over the line. Well, if you go over the line and you scrape, you don't have a T-bone. I think he fell asleep. Well, say he did. I still don't see how you get a T-bone instead of a scrape. If, in fact, if you overcorrect, Judge, as you know, you can turn very easily and get a T-bone if you wake yourself up. Oh, you mean if he falls asleep? Sure. Or if he's not paying attention. And then he overcorrects when he wakes up. Correct. And here he comes. See, and the U-turn never made any sense to me. Well, it could have if her kid had left a teddy bear back in Yuma or something. Right. But, see, what we did was we had the witness where she had been right before she left. And she never called back. So we took her deposition in which she stated. If you've ever had little kids in a car, though, you get 30 miles from a place and they say, I left my blanket or something. But there was nobody else in the car. She was by herself. See, so that's. What was your expert going to say, the one that was kept out? What was it? He came in timely on rebuttal because Mr. Spamer hired someone. So that's when I thought, well, we may have to get an argument over experts here. So I was using him in rebuttal timely. And he filed a report. What did he say? Basically, he said it was a T-bone and Mr. Young crossed the line based on the oil, the yaw mark, the skids, the glass and everything else. So I thought it was fairly evident here, especially in light of summary judgment. I mean, there was certainly enough evidence to defeat summary judgment. Did you want to say some rebuttal time? Yes, ma'am. Or did you have another point that you wanted to make? I thought in response to Judge Kleinfeld, I don't think you ever get there because you can't sue Mr. Young here. In this particular case, Mr. Young is under the Federal Tort Claims Act and under the Federal, what's it, the Federal Employees Liability and Reform and Tort Liability Act. He is immune from lawsuit. So whatever judgment or whatever non-judgment against Mr. Young, it's no good. It's void. You cannot sue him under the statute. You can only sue the United States. And originally in the case, if you recall, we had the Navy agreeing. And the Navy said, you need to sue the Navy. Okay. So we sued the United States under the Federal Tort Claims Act. And then they changed their mind and said, no, Mr. Young's liable. Well, then we find out not only can, do they want us to sue Mr. Young, he's driving a Navy's rental car. So as far as vicarious liability went or responding as superior, Navy's not responsible. The rental car company is responsible under their insurance contract. So in this particular case, you have the whole case turned on its head because you can't sue Mr. Young. You can't sue a business rental car. But now we are. That's who we have because they let the United States go under this false premise that Hawaii law controlled over Arizona law. And there's not a single case in Arizona that gave the United States the right to get out of this case. The law in Arizona was very clear. And I think I sent you additionally when Arizona, this is McLeod versus Kimbrough case, which said TDY, government car, you're covered as within course and scope of your job. And Arizona law is real clear. The district judge uses a case called Claymore that was out of Hawaii. So our position is we never get to the Young, the defendant Young motions. Mr. Young doesn't belong in this case, period. He is not a party. He can't be a party. So as far as vicarious liability, there can never be because he can't be a party. So he's void. He straight up doesn't belong here. Counsel, would you have done anything differently if the court hadn't granted summary judgment for the government on the scope of employment issue? Judge, we originally were going to file and did file an appeal on the government's getting out of the case. But as you know, you have to get it certified. We were almost finished with the case. They had tendered a judgment in the case. We were almost done. So I let that go. In retrospect, that was probably the way to go is to have gone ahead and done the appeal on the United States getting out of the case, stay the case, and get an answer. But as you know, that's fought with all kinds of difficulty because it's a different dynamic again, especially in a death case where the plaintiff's best witness obviously is dead. Had we had the opportunity, if she were alive, when you have a suggestion of death in the accident report, well, if the plaintiff would have been alive, we'd have had more information because the defendant young didn't remember anything. I'm not asking you to speculate. I'm just curious. Had the court said, actually, the government is on the hook, would you have changed your trial strategy? In other words, once the court said, or put it another way, if the court had said, like it did, government's not on the hook, did you say, well, gosh, the case is really over then because I can't go against the individual? In this particular case, Judge, that's the sum total because you can't go against the individual. But as you know, the district judge ruled that we did go against the individual. But as far as tactically, I don't think so because Mr. Young turned out to be a first-rate fellow and did not say that I'm not responsible, he just said I didn't remember what happened. He also said that he was in the course and scope of his job. There was no wishy-washy about him saying, well, maybe I was and maybe I wasn't. He insisted he was in the course and scope of his job and the Navy should have been responsible for him. So to kind of answer your question backwards, had the United States been in the case and not Mr. Young, the case would have been slightly different in the sense that it would have proceeded, but we would have worked around Mr. Young. This way we had to work through Mr. Young because he was the defendant. And we had an insurance company then for Avis that was responsible for him. Thank you, Counsel. We're going to hear from the other counsel now. Okay. Good morning. May it please the Court. I'm Jay Spamer on behalf of Master Chief Richard Young. I've agreed to limit my speaking time to seven and a half minutes. Counsel, could you help me on how the accident occurred? I don't see even assuming, let's assume for purposes of discussion, that the official report's hearsay exception applies, so the police report comes in. As far as I can tell, it could only come in for facts. It couldn't come in for opinions. And because there's no foundation to establish any kind of expertise in accident reconstruction. And what's critical is the policeman's opinion or speculation, depending on what you call it, his theory in the paragraph labeled investigation that the dead woman was making a U-turn. That's the evidence that it was her fault. What's the foundation for that? Let it in. Your Honor, I think there's a. . . The foundation for his expertise, I mean. Yes, I think the case that talks about that, Your Honor, is Beechcraft. I'm not asking for case right now. I'm asking for facts that show, for all I know, this is the first traffic accident this policeman ever investigated. He used to be on a vice detail, and he rides a bicycle to work. I have no idea. Yes, Your Honor. The police officer was not alone in conducting this investigation. There were five police officers listed. And was there a foundation on all five of them or any of the five? No, Your Honor, but the report and the photographs were prepared in the course of their official duties as DPS officers. Well, that means that the hearsay exception applies, but it doesn't mean that their opinions don't have to go through the Daubert gate. There has to be some foundation to show that they have the qualifications to render opinions on accident reconstruction. That's fine, Your Honor. But it's not the affidavit or opinions that we're talking about here. We're talking about the facts as contained in the police report. Well, her crossing, her making a U-turn is not a fact that the policeman observed. It's an opinion. He didn't see her make a U-turn. Based on his personal observation. And police officers are permitted to offer opinions if it is based, if the opinions are based on their personal observation. Has the policeman, has that policeman ever investigated another traffic accident, does the record say? No. We don't know. Does the record say whether he ever went to school for accident reconstruction? No, we don't know that either. Does the record say that he has apprenticed or studied in some way accident reconstruction? No, Your Honor. However, the police report is all. How would he know any more than I do about accident reconstruction? Gosh, come to think of it, I had years and years of this sort of litigation. Maybe I know more. He's probably in his 20s. I don't know. How old is he? It's not in the record, Your Honor, but I believe. But we don't know anything about him to know whether he knows what he's theorizing about. Your Honor, the. . . He has a uniform and a badge, so I'm supposed to believe his speculation and theory? Your Honor, the obligation to refute the only evidence presented to the court was on the plaintiff. Well, it wasn't the only evidence, which brings me to the deposition of Foote. Yes. And if what Judge Kleinfeld says is applied equally to the police report and to Mr. Foote, then the underlying facts, such as here are the photographs, which is what the police did. They took a lot of photographs. And Mr. Foote's saying here is where the puddle was, here is where the broken glass was. Those are facts. Yes, Your Honor. And if you leave aside everybody's opinions about those facts, why isn't there an issue of fact for trial? There is no issue of fact. Those facts require expert interpretation in order to. . . On both sides. Yes. Perhaps. But if you. . . I guess I just have difficulty with the assertion that there's not a factual dispute about what caused the accident when one party is dead and the other party has not the slightest clue what happened. The standard for the motion for summary judgment, Your Honor, as talked about by Judge Campbell in the lower court. We know the standard. What could a reasonable jury infer? If a jury had nothing except one witness is dead, the other witness can't remember, all the debris was in the southbound lane, why couldn't the jury infer the accident must have occurred in the. . . In the other person's fault, basically. As. . . I think I might have misstated which direction the lane was. No, I understand, Your Honor. But why couldn't the jury infer from all the debris being in her lane that the accident occurred in her lane? Because the, well, defendant's expert, who was timely disclosed, explained how the cars came together based on the physical evidence. We're going to leave that out right now. We're going to assume you properly kept out her expert, and we're going to assume for purposes of discussion the policeman's factual observations come in, but not his speculations and opinion. Same with the plaintiff. Just facts. Why couldn't the jury infer that the accident happened in her lane? Because the jury would need expert testimony to explain how the debris pattern ended up in that lane, Your Honor, and our expert. . . Why couldn't a layman infer that if the debris is in the lane, that's where the collision must have been, because things don't ordinarily fall off cars in the absence of a collision. Because the facts, as collected by the investigating officer, showed the skid marks of Chief Young beginning in his lane, southbound lane, and continuing in an angle towards the center of the road, as if he was trying to avoid a moving vehicle coming from his right. Once you get to the expert, that's where you're getting into opinion. So you're saying in addition to oil in her lane, debris in her lane, and scarred pavement in her lane, there's a skid mark in his lane that begins in his lane and veers into her lane. Yes. So why couldn't a jury infer from that that the accident happened in her lane? In terms of the evidence from Delmar Foote getting back to you. . . Look, we don't have any opinions for you. You draw your inferences if you can. And if you can't find by a preponderance of evidence that it was Young's fault and not hers, then return a verdict for the defendant. And why can't the jury say on the basis of those four facts, happened in her lane, must have been his fault? I think it would be right for a directed verdict because the plaintiff would not have been able to present sufficient evidence to infer that those facts lead to the inference of negligence on the part of Mr. Young. Why not? Because all the facts show is that two cars came together somewhere close to the middle of the road. Well, in her lane. No. No, Your Honor. Why couldn't a jury infer that the cars came together in her lane from those facts? The facts show that the cars only came together somewhere in near the middle of the road. Was the oil in the middle of the road or in her lane? Well, there's no. . . We don't see. . . Every inch of that accident scene between where the two cars came to rest was photographed by the police officers the day before, and there was no oil spill noted. We don't know where Delmar Foote may have seen this oil, let alone whether. . . Okay. The jury might have thought he was lying. They might have thought he was paid off. They might have rejected his testimony totally. But let's just suppose they accepted it. And his opinion that it came from her car? No, leaving out the opinion. No opinion. Let's suppose the jury accepted his factual observations as true. Did he say that the oil was in the middle or in her lane? He said it was close to the middle of the road in her lane, Your Honor. And what about the debris? Where did he say that was? He didn't say anything about the debris except being up along the side of the road. Which side? On the north side of the road. Her side? Yes. And what did he say about where this great pavement was? On her side. But that is also consistent, Your Honor, with . . . And what did the policemen say about the skid marks exactly? The police report shows the skid marks of Mr. Young's vehicle beginning squarely in his lane of travel, going at an angle, which means he's already reacting to another car, going at an angle towards the center of the road. Let's see. This is . . . This is a skid mark identified by the letter D in the police report. Which means . . . Kind of a schematic drawing, and I'm trying to figure it out. And we don't have . . . Page 3 of 5 of the police report? Well, I'm looking . . . Well, where most of the letters are in there. And you have on the right side vehicle number 1, which is believed to be Ms. Burnham's vehicle. To the left of that, you have B and D. D is the beginning of Mr. Young's skid mark in the southbound lane, continuing to F. G is identified as the other side of Mr. Young's car wheel beginning a skid mark, all taking place. Let's see. There are two skid marks, D to F and what, G to H? G to H. Yes, sir. And the center line is the heavy black line there down the middle, right? Well, it's a broken line, Your Honor, is the center line. The broken line is the center line? The heavy line is the shoulder of the road where both cars ended up. Well, the G to H skid mark looks like it ends in her lane. Or does it end . . . Yes. And our experts showed how . . . So the police skid mark would show that he skidded into her lane? I think that what that shows, according to our expert, was that it was the impact occurred somewhere near the center of the road, Your Honor. Thank you, counsel. You've exceeded the time that you've been allotted. Thank you. Thank you, Your Honor. May it please the Court. Sydney Foster for the United States, and I'll be addressing the scope of employment issue. This Court must determine how the Arizona Supreme Court would rule in this case as to whether or not Young was within the scope of employment at the time of this accident. That Court's decisions in Driscoll v. Harmon and State v. Superior Court, decisions which plaintiff does not cite, much less discuss, are to control this case and dictate that here Mr. Young was not within the scope of employment. What do you do about this Arizona court of appeals case? I know in some states the law is that a person on temporary duty isn't in the course and scope when he's off duty for the day, and in some he is in the course and scope when he's off duty for the day. And the Arizona, it looked like Arizona was kind of up in the air on that, and then this new case came down from the Arizona court of appeal saying person on temporary duty, government rent-a-car, he is on duty. If I thought it was just a fluky decision, I might want to predict that the Arizona Supreme Court wouldn't follow it. But it's not atypical. It's the way it usually works in workers' comp, and a lot of states go that way. Why shouldn't we assume that that's the law of Arizona? McCloud doesn't control here for two reasons. I know it doesn't control. We have to predict what the Arizona Supreme Court would say. Right. Why doesn't it serve as a good prediction? Two reasons. One, the factual situation in McCloud was different from the one here. And secondly, though, this court is bound by what it predicts the Arizona Supreme Court would do. And we believe that McCloud would not have been decided the same way by the Arizona Supreme Court. Well, we have to have ‑‑ ordinarily the rule is that we follow the intermediate court of appeals decisions unless we're affirmatively convinced that they would be rejected by the state Supreme Court. So we either have to be convinced that this case isn't so closely analogous that it would be decided the same way as McCloud, or that the Arizona Supreme Court is likely to reject McCloud. Right. And I ‑‑ we believe both of those are true. Let me start with the latter. The reason we think that the Arizona Supreme Court would reject McCloud is because in Driscoll and in State v. Supreme Court, those decisions notably are not even cited by the McCloud court, much less does that court explain how they are consistent with it. So that court does not explain. Those decisions are the two Arizona Supreme Court decisions that are most closely on point here, because they concern whether an individual, an employee's car trip that is connected in some way to his or her employment is within the scope of employment for purposes of respondeat superior doctrine. And those two decisions should have been discussed in McCloud, but were not. Those two decisions make clear that what's the key factor is whether or not the employer can exert control or a right of control over the employee at the time in question. And those ‑‑ Are those temporary duty cases, or are they just general respondeat superior cases? They're not temporary duty cases. That's correct. They're from ‑‑ one was a trip from a permanent duty station to home. That was Driscoll. That was Driscoll, correct. And then State ‑‑ Home. Exactly. State v. Superior Court was the trip of an individual who was going for his weekend National Guard duty, going over 50 miles to travel to that. They're not temporary duty cases. They're not. But the reasoning that ‑‑ that's correct. But the reasoning underlying those decisions ‑‑ The reasoning is pretty good. Right. But my problem is workers' comp goes the other way, and then McCloud goes the way workers' comp usually does. Right. So that's the second way in which McCloud is actually inconsistent with the Arizona Supreme Court's decisions in Driscoll and in State v. Superior Court. Not only does it ignore the whole right of control issue, but also it ignores the admonition in Driscoll to be wary of just importing workers' compensation principles into ‑‑ If Driscoll and the other case have nothing to do with temporary duty, their regular coming and going to home cases, then they wouldn't even be relevant to be cited in McCloud. I just don't understand that because the temporary duty cases in all kinds of contexts are just a separate animal from the standard coming and going cases. So I don't know how we cross‑pollinate there. Yeah. I don't think that they're so separate that they wouldn't be cited. The only Arizona Supreme Court case that is cited in McCloud is Shalik, a sexual harassment case which is even further afield than these automobile cases. The automobile cases, if you apply the reasoning, applies directly because those cases say that the inquiry is into whether or not there's a right of control, whether the employer can dictate, you know, the route, the, you know, when they go. Your argument is good, but enough states have this kind of temporary duty rule so that it's hard to call it silly. I mean, your argument is basically that it's silly. Out‑of‑town travel, temporary duty in town is not a material distinction. What's material is the employer's control. Well, that makes perfect sense as a matter of logic, but there are a number of states that don't go that way, so it's hard for me to say it's so out there that the Supreme Court wouldn't follow it. That's right. But there are ‑‑ and those states are more willing than Arizona's Supreme Court has expressed that it is willing in importing workers' compensation law into their responding to a superior doctrine. And this Court's decision ‑‑ or, sorry, the Arizona Supreme Court's decision in Driscoll was very clear that the two inquiries are different and that the decisions from workers' compensation shouldn't ‑‑ It's not totally stupid. I mean, when I'm home, I eat dinner at home every night. I'm not driving to or from dinner. But when I'm sitting, I'm always away from home, and I'm always eating dinner someplace other than home. In Pasadena, I'm always driving to and from dinner. So it's not stupid to say that temporary duty really matters. It greatly increases the risk of a car accident. No, I agree. It's not exactly the same situation. But what the Arizona Supreme Court has held matters. The right of control is lacking here. And if we were in a different state, this case could come out differently, even if we were in California, for example. But we're in Arizona where Driscoll has held that right of control is what's mattered, and it's held that what matters in that inquiry is examining whether or not the employer can control things like your route, your manner of travel, and so forth, and whether you have actual duties that you need to be performing while you're en route to your location. And that's the – if McCloud had explained how it's consistent with that decision and offered a convincing explanation, we would be in a different situation. Instead, it imported workers' compensation laws against – Well, it did more than that. It examined cases from all over the place, some of which were workers' comp cases, some of which were not. It also looked at Arizona's statutory and regulatory law to determine what the appropriate construct is. I mean, I think it's, to me, not correct to say they just kind of blindly said, oh, well, we'll just use whatever's in workers' comp. And so, you know, maybe it would have been more complete if they had cited those other cases, but that is different than saying that we have to be able to be convinced that the Arizona Supreme Court would reject this case. And I just want – I see my time is running short, so I respectfully disagree and think that if we apply the rationale of Driscoll and State versus Superior Court, that that just cannot be reconciled with the reasoning in McCloud. But this Court doesn't even need to reach that because, as I mentioned before, and as Your Honor referenced, this Court would need to extend McCloud if it were to hold that Young was within the scope of employment here. It's one thing to say, as McCloud did, that a meal that occurred right after the end of a duty shift or right before, but nonetheless on a work day in a government-owned vehicle was within scope. And it's quite another thing to say that someone like Young, who was on a holiday weekend, had no duties for four straight days, was doing nothing at the bidding of his employer, that he is within scope. And as this Court in Hartzell did when it refused to extend Anderson. But if he was home, he might be doing chores in the yard and eating his meals in his house, and if he's traveling, I guess he could buy a big bag of beef jerky and just eat in his hotel room every night. But most people probably don't do that. That's right. But again, the inquiry that the Arizona Supreme Court dictates that we should use is the right of control inquiry. And here, just as there would have been no right of control at home on a weekend if Mr. Young had chosen to go out for lunch, there's no right of control here. We believe that this Court should follow the Arizona Supreme Court's rulings in Driscoll and in State v. Superior Court. Thank you, counsel. Thank you. Mr. Boriaki, we will give you two minutes for rebuttal. Yes, ma'am. I think the point is well taken that the TDY here puts him within the course and scope under Arizona law. If you look at the briefing, there's a case J.D. Sutton, which is another Arizona case, whereby if you give, as the employer, a vehicle to your employee, virtually he's always in the course and scope. And it's really kind of insulting in this case, as Judge Kleinfeld said, that if in fact what are you supposed to eat? He was at Yuma Proving Grounds. There was no place for him to eat. And we make light of that in the brief that he's supposed to go to the bowling alley is where he's supposed to eat. And how many, he was there for weeks. This is not somebody who was there for 10 minutes or for a day. And having been in the Army myself and on TDY orders, as you all would if you're having to go to Pasadena and stuff like that, they're not confining you. You are indeed under their blanket. And in this particular case, the Navy indeed took him under their blanket, originally anyway. So if you look at it, and then there's the comptroller's opinion in there, which covered meals, haircuts, cleaners, drug stores, and anything reasonable that puts you under theirs. So they're paying for it. They're paying for his meal. So this is not someone who was just TDY. And the district court used that Claymore case from Hawaii, which was also different if you look past the original case and saw that it had nothing to do with a guy who was in TDY like Mr. Young was, which the court mentioned something like, well, if the guy had a head on the pillow because he was TDY, that would be different. Well, that's what you had in this case, head on the pillow. He was not anywhere near his home and had no facilities to do anything other than use government-authorized vehicles, gas, meals, and everything else. So this was very clear. And if you look at the Arizona court's decisions, anything reasonable puts him under. You give him the vehicle, puts him under, and McCloud, I think, makes it clear. Thank you, counsel. The case just argued is submitted, and we will stand adjourned for this morning's session.
judges: Carney, Kleinfeld, Graber